UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHIME MEDIA, LLC, *and* | § | |
| GEORGE O'CONOR | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:20-CV-221 |
| | § | |
| MARK RUCKMAN, *and* HALAGARD, INC.,* | § | |
| | § | |
| *Defendants.* | § | |

## ORIGINAL COMPLAINT

This dispute arises out of the unauthorized use of Plaintiff Chime's trade secrets by its former officer and fiduciary, Defendant Mark Ruckman, after Ruckman separated from the company in January 2018. Ruckman is using Chime's trade-secret information to personally profit through his company—Defendant Halagard—which Ruckman founded to carry out a derivative technology of Chime's to steal sales from Chime in the marketplace.

Chime owns patent-pending technology that facilitates a new kind of investment—it structures, services, and supports a repeatable revenue-based-securities process, which pays investors based on the issuing-company's top-line revenues. Companies typically raise capital through two traditional methods—debt or equity. But Chime discovered a way to unlock previously trapped value through institutionalizing revenue-based securities and, thus, a way for companies to raise funds and avoid the drawbacks traditional methods of raising capital.

During the time that Chime was developing and refining its patent-pending technology, Ruckman—an investor in Chime—served as Chime's Vice President of Operations. In his role,

Ruckman accessed and used the majority of Chime's confidential information, such as prospective-investor lists, prospect pipelines, go-to-market strategies and, perhaps most fundamentally, Chime's trade-secret technologies.

After Ruckman's separation from Chime, and unbeknownst to O'Conor, Ruckman formed Halagard.  Halagard purports to offer a new type of security through which SMBs[1] can use revenue-based securities in Chime's patent-pending form to raise capital. Put differently, Halagard purports to offer a strikingly similar product to Chime, the ostensible difference being that Ruckman says Chime markets itself to companies irrespective of their size (i.e., SMBs and large-cap companies) whereas Halagard purports to serve only SMBs.  Halagard could not have developed such a platform, much less in a matter of weeks or months, without using Chime's trade secrets.

As Halagard ramped up its efforts to obtain capital to develop its competing products in August 2018, Chime and O'Conor became the victims of an online smear campaign in which the viability of Chime and the integrity of O'Conor were the subject of outrageous, defamatory attacks.

In the process, Ruckman was forced to admit that he wrote and posted online at least one of the defamatory posts and, based on their conduct and wording, it appears Ruckman either authored the other posts and emails or that others working in concert with him wrote and published the defamatory statements, for which Plaintiffs Chime and O'Conor now sue.

## I.    JURISDICTION AND VENUE

1.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this Complaint includes claims arising under the laws of the United States, including the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq*.

---

[1]    "**SMBs**" means small-to-medium-sized businesses.

2.      This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state-law claims, including Plaintiff's claims for breach of contract, tortious interference, business disparagement, and defamation.

3.      And venue is proper in this District under 28 U.S.C. § 1391(b) because all Defendants reside in this judicial district.

## II.   PARTIES

4.      Plaintiff George O'Conor, Chime's principal, is a citizen of the State of Colorado and may be served in this action through undersigned counsel.

5.      Plaintiff Chime Media, LLC is a Delaware limited liability company with its principal place of business in Massachusetts, and it may be served in this action through undersigned counsel.

6.      Defendant Mark Ruckman, Halagard's principal, is, on information and belief, a citizen of the State of Texas and may be served with process at 4500 Pacer Way, Flower Mound, Texas, 75208, or wherever he may be found.

7.      Defendant Halagard, Inc. is a Nevada corporation with its principal place of business in Flower Mound, Texas. Halagard may be served by and through its registered agent for service of process, Mark Ruckman, at 4500 Pacer Way, Flower Mound, Texas, 75208, or wherever he may be found.

## III.   FACTUAL BACKGROUND

### A.   The investment problem presented by the current market.

8.      Many companies that are not publicly traded routinely find themselves in circumstances in which they would like to develop investment funds to use as capital, but their options

are severely limited by the types of capital traditionally raised in the market (i.e., debt or equity).[2] Some companies have no desire to give up control to shareholders, or perhaps are otherwise precluded from doing so. At the same time, however, those companies often want to raise capital to deleverage their portfolio, expand certain segments of their business, or to fuel growth.

9.      Concomitantly, investors face similar quandaries. When equities are at all-time highs (as they have been), investment opportunities with a reliable yield—that present predictable dividends and an equity-like upside—can be difficult to find.[3]

10.      So George O'Conor, Chime's CEO, set out to develop a novel investment type that is repeatable, overcomes the traditional barriers to equity funding, and provides an alternative, reliable investment opportunity.

**B.      O'Conor and Ruckman meet; Ruckman signs an NDA.**

11.      As O'Conor's idea took shape, he began attracting investors—all of whom learned about the novel investment vehicle subject to Non-Disclosure Agreements that protect Chime's intellectual property. One of those early investors was Mark Ruckman—a management consultant

---

[2]      With debt, a commercial bank or investor (private, institutional) typically lends funds to a company subject to specific requirements—such as monthly financial-reporting obligations or covenants that impose future financing limitations or performance-based principal payment requirements—and the amount borrowed is reflected as a debt on the company's balance sheet. Debt is often collateralized, and a loan's terms (e.g., interest rate or repayment obligations) vary depending on market conditions and the lender's balance sheet. With equity, an investor acquires a percentage of ownership in the company itself based on the valuation of the company as a whole. The primary drawback of raising capital through selling equity is that it dilutes existing ownership, particularly in connection with any liquidation preferences contained in the financing terms of any preferred equity units. A dilution of voting control also often flows from the dilution of ownership as a matter of course.

[3]      Equity and debt securities are valued based on the performance or creditworthiness of a company as a whole, with revenue-generating assets being grouped together during reporting; thus, businesses with a multiplicity of revenue-generating assets are often not properly valued because the limited disclosures (and corresponding accounting practices) average the performance of such assets rather than individually. Macroeconomic trends can also serve to dry up credit and artificially depress the value of well-performing companies during economic downturns.

with a background in IT and helping businesses source IT equipment and solutions, including expertise in supply-chain-purchasing analytics.

12.     Throughout 2014 and 2015, O'Conor had been commuting weekly between Boston and Steamboat Springs, Colorado. Defendant Ruckman was also traveling weekly between Boston and Steamboat Springs during that time, and, over time, the two became friendly as they often found themselves waiting to take the same flight.

13.     Although O'Conor knew that Ruckman was traveling back-and-forth in his supply-chain-analytics role for CVS, Ruckman remained in the dark as to what in particular O'Conor was working on with Chime. Indeed, O'Conor was intentionally circumspect with his work given the highly confidential nature of the securities technologies he was working on.

14.     In May 2015, after his flight out of Steamboat Springs was cancelled, Ruckman decided to drive to the Denver for an alternative flight to Boston. Upon learning O'Conor was taking the same Denver flight, Ruckman offered to give O'Conor a ride, which O'Conor accepted.

15.     During the drive to Denver, Ruckman continued to (cordially) press O'Conor on what exactly he was working on. O'Conor offered to tell Ruckman all about it, but only **after** Ruckman signed a non-disclosure agreement.  Ruckman agreed and, on May 22, 2015, Ruckman provided O'Conor with a signed NDA.[4]

**C.     In mid-2015, Ruckman invests in Chime and serves as its first Vice President of Operations.**

16.     After Ruckman signed the NDA, O'Conor told him about the novel technology that Chime was working on. Ruckman had never even heard of a revenue-backed security before.

---

[4]        Ex. 1, Ruckman and Chime Non-Disclosure Agreement.

17.     Ruckman asked O'Conor if he could invest in the company, and O'Conor agreed. On June 2, 2015, Ruckman invested $200,000.00 in Chime and later invested another $100,000.00.

18.     Ruckman did not want to be a passive investor; he wanted to be actively involved in the day-to-day operations of the company.  And, given Ruckman's background in supply-chain-purchasing analytics, O'Conor believed Ruckman could be a good fit and agreed to bring Ruckman on board in a role that would ultimately become Chime's Vice President of Operations.

### D.     Chime develops a novel (and patent-pending) securities process.

#### 1.     TRBS™: a new security that combines the best of traditional capital-raising methods.

19.     Chime set out to develop a way by which companies could raise capital while avoiding the downsides that traditionally accompany debt (e.g., substantial servicing costs) or sell-ing equity (e.g., dilution of ownership and control). Chime's creation is termed the True Revenue Based Security—trademarked TRBS™ and pronounced "turbo"—a security which provides a pre-dictable dividend with equity-like upside.

20.     Generally, revenue-based securities pay the investor from gross revenue arising from a defined set of revenue streams identified in the security—i.e., an alternative-security struc-ture through which an investor's returns are a function of the issuing-company's top-line revenues, typically calculated as a monthly percentage of gross revenues over a period of time. Stated simply, a revenue-based security is an agreed-split of a company's future revenues in exchange for an immediate capital investment.

21.     The TRBS™, in particular, is a flexible product that can take on either debt-like or equity-like characteristics, depending on whether the security is defined as terminal (i.e., limited to a specific time period) or perpetual. This flexibility allows TRBS™ to provide the best of both fixed income and equity—a predictable dividend with equity-type upside.

22.     TRBS™ provide several benefits over the traditional methods of raising capital.

23.     For issuer-companies, they provide a means to monetize specific revenue streams, thereby unlocking historically trapped value. A terminal (i.e., debt-like) TRBS™ is an improvement over traditional debt because, among other things, it allows issuers to avoid (a) substantial loan-servicing costs and (b) covenants which limit their ability to raise capital in the future. A perpetual (i.e., equity-like) TRBS™ is an improvement over selling equity because, among other things, it allows the issuers to raise capital without sacrificing control or diluting the ownership pool. Further, companies can use funds raised through issuing TRBS™ for a variety of purposes, such as paying down debt, investing in new projects, or funding acquisitions or R&D.

24.     For investors, TRBS™ allow for targeted investment into specific assets of a company that have a low correlation to markets and, thus, are not as susceptible to macro trends and economic downturns as other investment types. TRBS™ provide investors with (a) equity-like upside, (b) the potential for perpetual income, and (c) returns that are not subject to managerial manipulation.

**2.      Trbine: the engine that institutionalizes TRBS™.**

25.     The creation of TRBS™ was only the first step; the remaining, and more substantial, challenge was institutionalizing the process.  Previously, revenue-based securities were available as a one-off deal.  The problem that Chime set out to solve was not simply creating a new type of security, but developing a **repeatable** securities process that allows real-time trading and, eventually, scaling.

26.     O'Conor began working on creating the process in 2013 and, by mid-2015, had worked out all of the major technical issues. These processes are built into Trbine's platform, which provides analytics that help issuers, underwriters, and investors to accurately price TRBS™. TRBS™ are structured in a way that permits them to be traded on an exchange like any other

security, whether a public or private exchange. These processes and associated analytics allow real-time trading of TRBS™, and ensure that TRBS™ are serviced credibly, securely, and at scale.

27.     Through its patent-pending technology, Trbine provides expertise and tools to service, structure, and support TRBS™ reliably and repeatably alongside familiar financial institutions.

### 3.     Chime undertakes substantial efforts to protect its intellectual property.

28.     Ultimately, after five years of development, Chime had succeeded in creating a repeatable securities process, allowing for institutionalization of TRBS™.  Thus, on February 22, 2018, Chime filed for a patent on the system and process, which is currently pending with the U.S. Patent and Trademark Office. And, notably, to ensure maintenance of confidentiality of its technology, Chime expressly opted to forego seeking an international patent to ensure that its application would not be published.

29.     But Chime had already undertaken substantial efforts to protect its intellectual property long before applying for a patent. As a gatekeeping function, Chime required an executed NDA prior to introducing the technology to either a potential investor or client. Additionally, among other things, Chime's trade-secret information was stored on a secure, password-protected server to which only a select group of Chime principals had access to on a "need-to-know" basis. Further, in June 2018, Chime filed a trademark application for TRBS™.

30.     In short, Chime put into place multiple layers of safeguards to protect its confidential information, including its patent-pending technology. Only a handful of officers (i.e., fiduciaries) had access to this information, and even those fiduciaries were operating under an NDA. The only conceivable risk of disclosure would be through Chime's officers.

### 4.     Ruckman's access to Chime's intellectual property.

31.     Because Chime was developing what was a brand-new type of security (and associated processes), much of Ruckman's time at Chime was spent helping O'Conor create "pitch decks," which were presentations that Chime could take to the market an educate the various market-makers on this emerging technology. This further allowed O'Conor to educate Ruckman not only on revenue-backed securities generally, but on the specific innovations that Chime believed could unlock a new capital market as they worked on the pitch decks together.

32.     Ruckman spent the majority of his time working on the pitch decks. That work required Ruckman to have access to Chime's non-HR files, and he was provided passwords to protected servers on which Chime's intellectual property and other confidential information was stored. Ruckman accessed these trade-secret files on his personal computer.

### E.     Ruckman steps down as Vice President of Operations.

33.     During the summer of 2017, Chime hired Rich Kosowski to serve as Chime's Chief Operating Officer. In addition to his duties as COO, Kosowski was heavily involved in the documentation of Chime's patent-pending technology. It was immediately apparent that Kosowski and Ruckman did not get along; Ruckman felt Kosowski was too dismissive of the Ruckman's ideas on the project. Although O'Conor told them to "play nice," the relationship between Kosowski and Ruckman only deteriorated further.

34.     In late 2017, O'Conor met with Ruckman to discuss various issues, including the ongoing friction with Kosowski. The conversation was cordial, and everyone agreed that Ruckman was not a good fit in the day-to-day operations of Chime. By January 2018, while remaining an investor in the company, Ruckman no longer served as Chime's Vice President of Operations.  At the time, O'Conor had no indication that Ruckman felt scorned, or that Ruckman was about to launch a campaign to destroy O'Conor and Chime.

**F.      Ruckman forms Halagard.**

35.      In April 2018, and unbeknownst to Chime's CEO, Ruckman and several other Chime investors formed Halagard, Inc., a company that purports to provide a vertically integrated platform to facilitate investments between small- and mid-sized businesses (SMBs) and potential investors via the Internet. Halagard discloses that one of Chime's early investors, Jeanne Housman, has served as an advisor to Halagard since January 2018—i.e., several months before the company formed, and the same month that Ruckman separated from Chime.  And, on information and belief, Hausman introduced Ruckman to other investors in Chime to enable Ruckman to pitch Chime's investors on Halagard.

36.      Through public disclosures, Halagard purports to provide a means through which SMBs can raise capital by monetizing revenue streams through a security (Halagard's "D-IPO") generated by certain processes and maintained by Halagard's platform (its "Digital Ledger"), which is subsequently traded on an exchange. It is Chime's technology rebranded, with the addition that Halagard believes it can also create an exchange to complement its (misappropriated) security structure and associated platform.

**1.      Halagard's "D-IPO" is a rip-off of Chime's TRBS™.**

37.      Halagard purports to offer a security, a Digital Initial Private Offering (D-IPO), which Halagard issues through its platform after the performance of certain tasks (e.g., underwriting), that allows SMBs to raise capital based on revenue streams. Halagard differentiates raising capital through D-IPOs as opposed to traditional loans by noting that D-IPOs are a (revenue-based) means to raise capital while avoiding the expensive servicing fees associated with loans.[5] And, as

---

[5]      Ex. 2 at 18.

to equity, Halagard claims that D-IPOs are a superior means to raise capital because selling equity carries with it a loss of control over the direction of the company.[6]

38.     In essence, a D-IPO is a TRBS™ that is offered only to SMBs, whereas TRBS™ can be utilized by companies regardless of size. On information and belief, Halagard's D-IPO was created through use of Chime's trade-secret information that Ruckman was exposed to while serving as an officer of Chime.

### 2.     Halagard's "Digital Ledger" is a rip-off of Chime's Registry.

39.     Halagard's "Digital Ledger" serves as a library where it records and stores historical and current data relating to investors, institutions, D-IPOs, trades—effectively, it is a repository of information that enables the Halagard platform to function. The Ledger is what allows Halagard to create a platform that facilitates real-time trading and allows investors to access funds in minutes as opposed to days.

40.     In essence, Halagard's Digital Ledger is a variation of the registry that underlies the Trbine platform. On information and belief, Halagard's Digital Ledger was created through use of Chime's trade-secret information that Ruckman was exposed to while serving as an officer of Chime.

### 3.     Halagard's platform relies upon the same trade-secret processes that Chime spent years developing.

41.     A fundamental truth of creating a new product and associated market is that it takes time—reducing a concept to a product often reveals that ideas believed to be obviously true are wrong. Finding what actually works for the market often requires years of trial-and-error, resolving

---

[6]     Id.

technical issues, and refining the product in response to market feedback. Only after such efforts are undertaken can a viable go-to-market strategy be developed and introduced to market-makers.

42.     For over six years, Chime worked relentlessly in developing the processes that allowed TRBS™ to be institutionalized—i.e., a method through which traditionally one-off securities are rendered repeatable and thus capable of being scaled. The outcome of the fine-tuning of Chime's process resulted in the creation of TRBS™ and patent-pending Trbine platform. Stated another way, Chime's innovation was not simply the security (i.e., TRBS™) but, more fundamentally, the methods and processes through which the creation and trading of a revenue-backed security a repeatable and scalable process (i.e., the processes underlying the Trbine platform).

43.     Halagard describes its process for facilitating the trading of D-IPOs as the "secret sauce" behind its technology.[7] Review of the process Halagard discloses, however, reveals that Halagard has taken Chime's processes and used them to create a competing platform.

44.     Ruckman, subject to the NDA and fiduciary duties as an officer, was granted broad access to Chime's trade-secret files when he served as the company's Vice President of Operations. Creating the pitch decks, which constituted the majority of Ruckman's work at Chime, required Ruckman to refine the presentations in light of the various solutions Chime was coming up with as they encountered obstacles in creating the new technology—e.g., the creation of a secondary market and liquidity for investors who purchase TRBS™. Likewise, Chime developed a method to audit TRBS™ in real time, which enables scaling—as opposed to one-off investments, the audit function allowed Chime to potentially enable the creation of tens of thousands of TRBS™. Ruckman was constantly kept apprised of both (1) technical and process issues that Chime was encountering, and (2) the solutions Chime developed to resolve those issues.

---

[7]     Id. at 16.

45.     Chime worked on developing and troubleshooting its Trbine platform for years, yet Halagard was purportedly able to build a substantially identical trading platform within months of Ruckman's separation from Chime. On information and belief, Halagard could not have created its platform and associated processes for trading D-IPOs without using the trade-secret information that Ruckman obtained when working on TRBS™ at Chime.

### 4. Ruckman uses Chime's confidential go-to-market strategy to launch Halagard.

46.     As explained above, Ruckman had never heard of a revenue-backed security before becoming involved with Chime (and after signing the May 2015 NDA). Ruckman's background was in analytics, not introducing a new product to market. But, as he worked on pitch decks with O'Conor, O'Conor educated Ruckman not only on how to take a Trbine-like product to market, but exactly how Chime was going to build the entire ecosystem—from how to introduce the product to market-makers (e.g., institutional investors, issuers, etc.) to scaling across a wide variety of industries and cap sizes. Chime's go-to-market strategy was confidential, proprietary, and derived from the expertise of Chime's principal and his experience in successfully introducing new products to market from his prior endeavors.

47.     On information and belief, Ruckman utilized Chime's go-to-market strategy to form and grow Halagard, and that strategy was confidential, proprietary, and accessible to Ruckman in his capacity as an officer of Chime until January 2018. Indeed, as Chime learned from a potential investor who Ruckman pitched Halagard to, Ruckman characterized Halagard's platform as the next generation of the Trbine platform, and **that Halagard was "Chime 2.0."** On information and belief, without use of Chime's go-to-market strategy, Halagard would not be viable.

**G.    Halagard, led by Ruckman, launches a smear campaign against Chime and O'Conor in an effort to drive Chime out of the marketplace.**

48.    Ruckman never informed O'Conor that Ruckman intended to form a company to compete with Chime. In fact, it was not until August 2018 when O'Conor became aware of Halagard's existence, and Ruckman's plan to destroy Chime.

49.    On August 24, 2018, four of Chime's investors—Ruckman, Lucie Salhany (Chairman of Halagard's Board of Directors), Michael Avery, and John Tyler—sent Chime a request for its corporate records (e.g., financial records, investor lists, and patent/trademark applications).[8] Chime agreed to provide the requested information, some of which was not subject to mandatory disclosure, if—as offered by their attorney—the requestor-investors would each sign an NDA drafted by their attorney before being provided access to the materials.

50.    Tellingly, only two of the four requestor-investors are officers of Halagard, and **only the two Halagard officers (Ruckman and Salhany) refused to sign the NDA**. Avery and Tyler signed the proposed NDAs and were provided access to the request materials except for the patent application due to its highly confidential nature.[9] Chime did not, however, provide the confidential materials to either Ruckman or Salhany because they refused to sign their own attorney's NDA.

51.    On August 30, 2018, while Chime was collecting the requested materials and waiting on executed NDAs, O'Conor received a derogatory and abusive email from an anonymous ProtonMail[10] account, stopchimefraudnow@protonmail.com, falsely accusing O'Conor of being

---

[8]    Ex. 3.

[9]    Ex. 4.

[10]    ProtonMail is a free, encrypted email service based in Geneva, Switzerland and thus subject to stringent Swiss privacy laws.

a "two bit con man" and engaging in licentious conduct towards women.[11] Further, on information and belief, Chime investors known to the author of the email were Bcc'd. As O'Conor would soon discover, it was the opening salvo of a campaign designed to destroy O'Conor's reputation in the finance industry and prevent (or, at minimum) inhibit Chime's ability to bring TRBS™ to market.

52.     And, perhaps tellingly given what followed, Halagard was actively trying to raise capital to create its platform in August 2018.[12]

**1.      In October 2018, Ruckman begins to publish a series of defamatory statements online.**

53.     As Ruckman learned while working for Chime, bringing a new security to market requires more than creating the security itself—you also need to build and educate the market. This requires socializing the product with market-makers (e.g., institutional investors, issuers) to both (1) create awareness and interest in the product and (2) obtain feedback as to modifications or functions that are attractive to the real world. Ruckman was helping O'Conor do this when Ruckman worked for Chime: build pitch decks that O'Conor would take to various market-makers to explain the unique value proposition of TRBS™ and the Trbine platform.

54.     In short, O'Conor taught Ruckman the importance of relationships and reputation in ensuring Trbine would be success. Chime has spent years educating market-makers and generating interest in the concept underlying the Trbine platform and, as a result, had a substantial head-start over Halagard in socializing TRBS™ and creating awareness of Trbine. It appears that Ruckman decided, in order for Halagard to be able to compete with Chime in raising funds, Chime had to be discredited and O'Conor's reputation destroyed.

---

[11]     Ex. 5.

[12]     Ex. 2.

### a. *October 2, 2018 #reportscam post.*

55.     On the morning of October 2, 2018, a post was made to the website reportscam.com by user "markrblueruck,"[13] although the user subsequently changed the name to "complainant21." The post accuses O'Conor of running a "scam," and that investor money never goes to develop the product but to support O'Conor's "lifestyle":



56.     **Ruckman admitted he authored this post** on October 15, 2018 and represented that he would have it taken down.[14] As of December 21, 2018, however, the defamatory post remained published on reportscam.com.[15]

---

13          Ex. 6.
14          Ex. 7.
15          Ex. 8.

### b. *October 2, 2018 ScamShare post.*

57.     Shortly thereafter, at 11:12 a.m. on October 2nd, a strikingly similar post was up-loaded to a similar website, scamshare.com:



58.     In addition to the same allegations posted to #reportscam, the ScamShare post added additional false allegations of lascivious conduct. Although he admitted to posting the #re-portscam statements, Ruckman denied that he was responsible for the ScamShare post.

59.     Despite Ruckman's denials, the similarities between the form and content of the two posts suggests common authorship, including: (1) allegations that O'Conor used investor money to fund a lavish or "unrestrained" lifestyle between "Weston MA" and "Steamboat Springs

CO"; (2) that Chime has raised $3M in blocks of $250,000 investments over a 3-year period (i.e., since the time Ruckman first learned of the opportunity). Although Ruckman claims someone must have "spring boarded" his original post, on information and belief, Ruckman or someone working in concert with Ruckman posted the defamatory statements on ScamShare.com.

### c.   *October 2, 2018 (administratively removed) Reddit post.*

60.     Twenty minutes after the ScamShare post, Reddit user "georgeoconor," who created their Reddit account on the day of the post, published statements regarding Chime Media on the r/Scams subreddit, but it was quickly removed by the moderator for failing to proffer any proof:



61.     As shown in the above screenshot, for proof, "georgeoconor" referred the modera-tor to "Joseph Messina Esq" in "Boston MA."[16] Mr. Messina was the attorney that requested Chime's records on behalf of four investors, including Halagard principals Ruckman and Salhany.

62.     On information and belief, in addition to the #reportscam and ScamShare posts which immediately preceded the Reddit post, the defamatory statements published to Reddit were also written by Ruckman or another working in concert with Ruckman.

63.     Chime sent Ruckman a cease-and-desist letter on October 15, 2018.[17]  Ruckman admitted to publishing the #reportscam post but denied publishing the others despite the substantial similarities in substance and syntax.[18] Ruckman further represented he would have the #reportscam post taken down but, more than two months later, it was still publicly available.[19]

> **2.     On information and belief, Ruckman authored a series of defamatory emails through encrypted and anonymous email accounts.**

64.     As noted above, ProtonMail is a free, encrypted email service that prides itself on protecting its users' anonymity.[20] It is their written policy "to collect as little user information as

---

[16]     It is notable that "georgeoconor" uses the same naming conventions for geographical places as the poster to #reportscam and ScamShare—i.e., "Boston MA," "Weston MA," and "Steamboat Springs CO," always abbreviating the state and without a separating comma.
[17]     Ex. 9.
[18]     Ex. 7.
[19]     Ex. 8.
[20]     *See* PROTONMAIL—SECURITY FEATURES ("Unlike competing services, we do not save any track-ing information. By default, we do not record metadata such as the IP addresses used to log into accounts. As we have no way to read encrypted emails, we do not serve targeted advertisements. To protect user privacy, ProtonMail does not require any personally identifiable information to register."), *available at* https://protonmail.com/security-details.

possible to ensure a completely private and anonymous user experience when using [ProtonMail]."[21] And, ProtonMail "will only disclose the limited user data we possess if we are instructed to do so by a fully binding request coming from the competent Swiss authorities (legal obligation)."[22]

65.     ProtonMail is intended to be used by repressed minorities (e.g., political dissidents) and provide a means through which they can communicate without fear of government retribution. The anonymity that is a hallmark of the service also allows ProtonMail to be used for more nefarious means, such as a campaign of harassment.

66.     And, a within months of O'Conor sending Ruckman a cease-and-desist letter, O'Conor began receiving harassing and defamatory emails from various ProtonMail accounts to which Chime investors were Bcc'd.

67.     For example, on May 11, 2019, O'Conor received an email from "jacksonhole12@protonmail.com," which claimed that O'Conor was misleading investors and "losing credibility by the month."[23] Notably, the email parrots the same false claim posted online in October 2018—i.e., that O'Conor used investor funds "to pay for [O'Conor's] lifestyle."[24]

68.     From there the anonymous email attacks only ramped up.

69.     On September 3, 2019, O'Conor received an email from "oldnorthchurch@protonmail.com" threatening to "pass all relevant documents" to federal authorities after claiming that O'Conor was "running a hybrid PONZI scheme."[25]

---

[21]     *See* PROTONMAIL—PRIVACY POLICY, *available a*t https://protonmail.com/privacy-policy.
[22]     *See Id*.
[23]     Ex. 10.
[24]     Id.
[25]     Ex. 11.

70.     Notably, the September 3rd email claims that "[w]e've asked for income statements, P&Ls" and similar financial data from Chime—i.e., through Messina's October 2018 letter requesting records—but that request was "to no avail."[26] As noted above, Chime **did** in fact provide those records to Messina to be shared with the two investors (Michael Avery and John Tyler) who signed the NDA.[27] It is thus reasonable to conclude that the person(s) behind "oldnorthchurch" (and thus author(s) of the email) are Halagard principals Ruckman and/or Salhany. Salhany separately responded, suggesting that Ruckman is the user of this particular email account.

71.     Two days later, on September 5, 2019, O'Conor received another email  from "oldnorthchurch" reiterating many of the same false allegations in its September 3rd email and threatening to contact the SEC.[28] It is remarkable, however, that the author characterized Chime's patent-pending technology as its "**secret sauce**."[29] This is the precise phrase that Halagard uses to describe the Halagard platform to investors,[30] suggesting that the author(s) of Halagard's August 2018 white paper (likely Ruckman) is the person(s) behind "oldnorthchurch".

72.     Subsequently, on September 16, 2019, "oldnorthchurch" emailed Chime principal Brad Ross, threatening Ross's FINRA license. Particularly relevant to this dispute is the unique (mis)spelling of summary judgment used by the author: "**Summery judgement**."[31] A separate email was sent to O'Conor the same day, again lodging false accusations, and suggesting that O'Conor defrauded "our friend Housman."[32] Notably, as with Ruckman and Salhany, Housman is a Halagard principal and early investor.

---

[26]      Id.
[27]      Ex. 12.
[28]      Ex. 11.
[29]      Id. (emphasis supplied).
[30]      Ex. 2 at 16 ("Exactly how our process will work is part of the **secret sauce** which is patent pending.") (emphasis supplied).
[31]      Id. (emphasis supplied).
[32]      Ex. 13.

73.     A few weeks later, on October 11, 2019, O'Conor received another email from "jacksonhole12," which effectively lodged the same false allegations as "oldnorthchurch" made in the September 3rd and 16th email. And, **tellingly**, "jacksonhole12" uses the same misspelling of "**Summery Judgement**" as "oldnorthchurch."[33]

74.     On information and belief, the author and account holders of "oldnorth-church@protonmail.com" and "jacksonhole12@protonmail.com" are the same person(s). Further, on information and belief, Ruckman or others working in concert with Ruckman are the authors of the defamatory emails and owners of the ProtonMail accounts at issue.

### 3.     O'Conor is "email bombed" and "text bombed."

75.     Around 2:30 p.m. CST on October 31, 2019, O'Conor began receiving email bombs,[34] sending hundreds of spam emails to his business account. **In less than 24 hours**, by about 11am CST on November 1st, **O'Conor had received approximately 20,000 emails from spam subscription lists**.[35]

76.     A few days later, on November 6, 2019, O'Conor's personal cell phone was "text bombed."[36] More particularly, within a 10-minute period, O'Conor received text-message notifications confirming over 5,000 separate spam subscriptions.

---

[33]     Ex. 14.
[34]     *See, e.g.*, Center for Internet Security, "EI-ISAC Cybersecurity Spotlight—Email Bombs", *available at* https://www.cisecurity.org/spotlight/cybersecurity-spotlight-email-bombs/ ("**An email bomb is an attack against an email inbox or server designed to overwhelm an inbox or inhibit the server's normal function, rendering it unresponsive, preventing email communications, degrading network performance, or causing downtime**. The intensity of an email bomb can range from an inconvenience to a complete denial of service. Typically, these attacks persist for hours or until the targeted inbox or server implements a mitigation tactic to filter or block the attacking traffic.") (emphasis supplied).
[35]     Ex. 15.
[36]     Ex. 16. A text bomb is a corollary of an email bomb, except that the attack targets the victim's mobile phone as opposed to email account.

**H.    In December 2019, Chime sends Ruckman another cease-and-desist letter.**

77.    By December 2019, it appeared that Ruckman's efforts to undermine Chime and personally attack O'Conor would not stop. Ignoring the attacks only seemed to embolden O'Conor's attacker(s), and Halagard continued to use Chime's trade-secret information in an effort to make Halagard's platform viable.

78.    Thus, on December 20, 2019, O'Conor engaged counsel and sent Ruckman another cease-and-desist letter, demanding that Ruckman immediately stop making false representations to Chime's investors and, more fundamentally, stop using Chime's trade-secret processes to create a competing business.[37] In response, Ruckman did not deny the allegations, nor did he agree to cease the unlawful conduct; he simply stated that he will need to engage counsel and would respond in the coming months.[38]

79.    Despite Chime's substantial efforts to proactively resolve the above conduct, Halagard and Ruckman continue to use Chime's trade-secret information and defame Chime and Chime's principal, O'Conor, in an effort to undermine O'Conor's credibility and poach investors from Chime for Halagard's benefit.

---

[37]    Ex. 17.
[38]    Ex. 18.

## IV.   CAUSES OF ACTION[39]

### A.   Count I: Violation of the Defend Trade Secrets Act
(All Defendants)

80.   Plaintiff Chime asserts its claim consistent with 18 U.S.C. §§ 1836, *et seq*. against Defendants Ruckman and Halagard, who misappropriated Chime's trade secrets.

81.   Chime's trade-secret information is related to a product and service used, or intended for use, in interstate commerce. Those trade secrets include: (a) Chime's system and process which institutionalize TRBS™; (b) compilations and/or list of prospective investors; (c) compilations and/or lists of investors and their contact information; (d) compilations and/or lists of prospect pipelines (i.e., the entities and institutions raising capital through TRBS™); (e) letters of intent with entities and institutions; (f) Chime's go-to-market strategies to create the market itself; and (g) Chime's business and strategic plans, company objectives, and marketing strategy and targets. This information has value by virtue of its secrecy, and through it, Chime is able to bring Trbine and TRBS™ to market, secure institutional participants, and maintain, secure, and increase investors in a fashion that any Chime competitors cannot duplicate.

82.   Compiling and maintaining this information provides Chime with a competitive advantage that allows it to bring TRBS™ to the market; it is not generally known outside of Chime; and is valuable as a result and would give any would-be competitors—like Halagard—an unfair competitive advantage.

83.   Because of the value of the information, which Chime has spent a significant amount of time and money and effort developing, Chime restricts access to this information so that anyone exposed to it is subject to a Non-Disclosure Agreement. Chime stores the information on

---

[39]   For this section and the remaining sections of this Complaint, Plaintiffs hereby incorporate and adopt by reference all of the content set forth above and below.

a password protected server, which passwords are provided only on a need-to-know basis. Chime terminates any access to this information at the conclusion of employment.

84.     Ruckman came to know this information because he consented to an NDA and eventually became an officer of Chime, as his position and role at Chime necessitated him knowing it to understand how it all works together and thus how best to explain the novel investment vehicle to potential institutional participants and potential investors. Ruckman therefore acquired it through improper means and under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, and Halagard derived it from or through a person who owed a duty to Chime to maintain the secrecy of the trade-secret information or limit the use of the trade-secret information.

85.     Ruckman and Halagard have misappropriated that information by knowingly acquiring it through improper means or knowingly or with reason to know that Ruckman had acquired it under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, as well as by disclosing and using it in Ruckman's new venture, Halagard, without Chime's express or implied consent at the time of the use or disclosure. Use of that information will provide Ruckman with an unfair competitive advantage and cause significant harm to Chime, including, among other things, the loss of the value of that information, as well as potential losses of investors and institutional participants.

86.     Defendants' misappropriation was willful and malicious.

87.     Defendants' misappropriation of this information has directly and proximately caused an injury to Plaintiffs, which is immediate and irreparable and thereby requires relief and remedies available through the Defend Trade Secrets Act of 2016.  In addition, or the alternative if necessary, Defendants' actions have resulted in actual and consequential damages, as well as an

award for twice the amount of damages awarded for Defendants' misappropriation, to which Plaintiffs are statutorily entitled because Defendants' misappropriation was willful and malicious.

**B.    Count II: Breach of Contract**
**(Defendant Ruckman)**

88.    On May 22, 2015, Ruckman executed an NDA in connection with being provided with access to Chime's confidential, proprietary, and trade-secret information. The NDA is a valid and enforceable contract.

89.    Upon Ruckman's execution of the NDA, Chime provided Ruckman with access to Chime's confidential and trade-secret information. Chime therefore performed its obligations under the NDA.

90.    Ruckman breached the NDA by, among other things, using Chime's trade-secret information in violation of the NDA's confidentiality provisions.

91.    As a result of Ruckman's breach of the NDA, Chime has suffered, and continues to suffer, injury.

**C.    Count III: Tortious Interference—Existing Contract & Prospective Relations**
**(All Defendants)**

92.    Defendants tortiously interfered with Chime's valid, existing contracts with Jeanne Housman, Lucie Salhany, John Tyler, and Jeff Hudson. Defendants did so willfully and intentionally, and their conduct complained-of above, including, without limitation the defamatory statements published by or for the benefit of Ruckman and/or Halagard, was independently tortious and/or wrongful. Defendants' interference proximately caused Chime injury, and Chime suffered actual damage and loss as a result of Defendants' conduct.

93.    Defendants also tortiously interfered with Chime's prospective economic advantage, including without limitation, with a significant Dallas-based family office, as well as an

investor group led by Mark Lynch and Keith Bryant Welch. Defendants did so willfully and intentionally, and their conduct complained-of above, including, without limitation the defamatory statements published by or for the benefit of Ruckman and/or Halagard, was independently tortious and/or wrongful. Defendants' interference proximately caused Chime injury, and Chime suffered actual damage and loss as a result of Defendants' conduct.

**D.**     **Count IV: Defamation**
           **(All Defendants)**

94.     Representatives of Halagard, including but not limited to Ruckman acting within the course and scope of his employment with Halagard, have made numerous defamatory public comments as statements of fact, both in writing and orally, including but not limited to: (a) stating that Chime was a "scam" or a "hybrid PONZI scheme", (b) stating that O'Conor used Chime-investor funds to support an "unrestrained lifestyle," (c) stating that Chime officers were violating securities laws and at risk of losing their licenses, and (d) accusing O'Conor of various types of professional and personal immorality.

95.     These statements, among others, were false and defamatory.

96.     Defendants, as to the truth of the public statements, acted with actual malice.  Alternatively, and if necessary, Defendants were negligent in making these statements of fact.

97.     Plaintiffs have suffered pecuniary injury as a proximate result of these defamatory public comments.

**V.     ATTORNEYS' FEES**

98.      Plaintiffs have retained Mitzner Kawalek LLP to recover its trade-secret and proprietary information. Pursuant to 18 U.S.C. §§ 1836 and 1962, Plaintiffs are entitled to and hereby seek, recovery of all of its costs and expenses, including its reasonable attorneys' fees.  In the

alternative, pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code, Plaintiffs are entitled to recover their attorneys' fees arising from Ruckman's breach of contract.

## VI.   JURY DEMAND

99.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a jury trial.

## VII.   PRAYER

100.     For these reasons, Plaintiffs Chime Media, LLC and George O'Conor respectfully request that

    a.   Defendants be cited to appear and answer herein.

    b.   the Court enter an order directing Defendants to (a) destroy any and all copies of Chime's trade-secret information, or products or services derived from Chime's trade-secret information, and (b) identify all persons or entities with whom Chime's trade-secret information was shared.

    c.   Plaintiffs have judgment against Defendants for their actual damages, exemplary and other statutory damages, and interest to the extent allowed by applicable law, together with its reasonable and necessary attorneys' fees and all costs of court.

101.     Plaintiffs further request all such other relief to which they may be entitled, whether at law or in equity.

DATED: January 28, 2020.

MITZNER KAWALEK LLP

By: _____
Matthew M. Mitzner
Texas Bar No. 24068911
matthew@mk-llp.com
Michael J. Kawalek
Texas Bar No. 24068687
michael@mk-llp.com
Thanksgiving Tower
1601 Elm Street, Suite 1995
Dallas, Texas 75201
Tel: (214) 810-1488
Fax: (214) 614-6147

ATTORNEYS FOR PLAINTIFFS