IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
TEXAS SHERMAN DIVISION

| | |
|---|---|
| CHIME MEDIA, LLC, and GEORGE O'CONOR, <br><br> Plaintiffs, <br><br> v. <br><br> MARK RUCKMAN, and HALAGARD, INC., <br><br> Defendants. | Case No. 4:20-cv-00071 <br><br> **Jury Trial Demanded** |

## AMENDED COUNTERCLAIMS OF DEFENDANT MARK RUCKMAN

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Defendant Mark Ruckman ("Ruckman") hereby files his Amended Counterclaims against George O'Conor ("O'Conor") and Chime Media, LLC ("Chime") (collectively, "Counterclaim Defendants"), and for his causes of action, and based upon the information and belief presently available, would respectfully show the Court as follows:

## PARTIES

1. Ruckman is a resident of the State of Texas.

2. Halagard was at all time relevant a Nevada corporation with its principal place of business in Flower Mound, Texas.

3. Upon information and belief, Chime is a Delaware limited liability company with its regular and established place of business in the State of Massachusetts.

4. Upon information and belief, O'Conor is a resident of the State of Colorado.

## JURISDICTION AND VENUE

5. Ruckman incorporates by reference Counterclaim paragraphs 1-4 above, as if fully set forth herein.

6. Counterclaim Defendants have consented to the personal jurisdiction of this Court at least by commencing this action in this District, as set forth in the Complaint. Moreover, this Court's jurisdiction is proper under at least 28 U.S.C. §§ 1331, 1367, and 2201-02.

7. Based on Counterclaim-Defendants' filing of this action, venue is proper in this District pursuant to at least 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

8. Ruckman incorporates by reference Counterclaim paragraphs 1-7 above, as if fully set forth herein.

9. Upon information and belief, O'Conor is the Chief Executive Officer of Chime.

10. As of September 6, 2018, and upon information and belief, O'Conor was the sole Director of Chime (Dkt. 1-4 at p. 1).

11. Upon information and belief and according to O'Conor, as of September 6, 2018, Chime had been developing technology and processes to support a new financial product called "True RBS" (Dkt. 1-4 at p. 1).

12. Upon information and belief and according to O'Conor, as of September 6, 2018, Chime or an associated entity was in a "development mode" with respect to the "True RBS" product (Dkt. 1-4 at p. 1).

13. Upon information and belief, the "True RBS" product referenced by O'Conor in his September 6, 2018, letter (Dkt. 1-4 at p. 1) is the same "TRBS" or "TRBS™" product referenced in multiple paragraphs of Plaintiffs' Complaint including, but not limited to, paragraph 81 of the Complaint.

14. Upon information and belief, Chime had generated no revenues and had no customers as of September 6, 2018 (Dkt. 1-4 at pp. 1-2).

15. Upon information and belief, Chime did not have sufficient cash to pay an accountant to prepare its financial statements or review its financial records (Dkt. 1-4 at p. 2).

16. As of January 9, 2018, Ruckman had left Chime and was no longer an employee, officer, or agent of Chime.

17. Upon information and belief, Ledgewood Design LLC ("Ledgewood") held membership interests in Chime in 2015 and 2016.

18. Based upon public records and upon information and belief, Ledgewood dissolved or was dissolved on or about June 30, 2018.

19. Upon information and belief, including but not limited to the information obtained from the web page found at http://www.globalsounding.com/big-data-analytics-global-water-climate-environment-geologic-resources-worldwide/about, O'Conor is or was the sole member and Chief Executive Officer of Ledgewood.

20. Upon information and belief, including information obtained from the web page found at http://www.globalsounding.com/big-data-analytics-global-water-climate-environment-geologic-resources-worldwide/about, Ledgewood is the company which created the Chime technology.

21. Pursuant to a first Purchase Agreement dated June 2, 2015, New Direction IRA, Inc. paid to Ledgewood—for the sole benefit and on behalf of Ruckman—the amount of $200,000, in exchange for a 0.4 percent membership interest in Chime. A copy of the first Purchase Agreement is filed with this pleading as Exhibit 1. At the time the first Purchase Agreement was executed, and upon information and belief, Ledgewood held membership interests in Chime.

22. Pursuant to a second Purchase Agreement dated December 12, 2015, New Direction IRA, Inc. paid to Ledgewood—for the sole benefit and on behalf of Ruckman—the amount of $100,000, in exchange for an additional 0.2 percent membership interest in Chime. A copy of the second Purchase Agreement is filed with this pleading as Exhibit 2. At the time the second Purchase Agreement was executed, and upon information and belief, Ledgewood held membership interests in Chime.

23. Pursuant to a third Purchase Agreement dated January 5, 2016, Ruckman paid to Ledgewood the amount of $50,000, in exchange for an additional 0.1 percent membership interest in Chime. A copy of the third Purchase Agreement is filed with this pleading as Exhibit 3. At the time the third Purchase Agreement was executed, and upon information and belief, Ledgewood held membership interests in Chime.

24. Upon information and belief, Ledgewood held an aggregate membership interest in Chime of at least 28 percent at the time each of the aforementioned three Purchase Agreements was executed.

25. Under the terms of, and as a result of, the aforementioned three Purchase Agreements, Ruckman acquired from Ledgewood a 0.7 percent aggregate membership interest in Chime.

26. Pursuant to sub-paragraph 3.3 of each of the aforementioned Purchase Agreements, Ruckman acquired the aforementioned membership interests in Chime for Ruckman's own account and for investment purposes in Chime, and not for the account of any other person or entity, including O'Conor.

27. Upon information and belief, O'Conor was the sole member of Ledgewood as of September 6, 2018, and when each of the aforementioned three Purchase Agreements was signed by O'Conor (*see, e.g.*, Dkt. 1-4 at p. 2) (O'Conor representing that, starting in 2012, all cash for

4

Chime operations "was generated by Ledgewood selling its/my membership interests in Chime to investors").

28. Upon information and belief, Ledgewood was the alter ego of O'Conor when each of the aforementioned three Purchase Agreements was signed by O'Conor (*see, e.g.*, Dkt. 1-4 at p. 2) (O'Conor representing that, starting in 2012, all cash for Chime operations "was generated by Ledgewood selling its/my membership interests in Chime to investors").

29. Upon information and belief, beginning in 2012 and until at least September 6, 2018, all cash for Chime's operations was provided by Ledgewood (Dkt. 1-4 at p. 2).

30. Upon information and belief, beginning in 2012 and until at least September 6, 2018, all cash for Chime's operations was generated by and through Ledgewood's sales of its membership interests in Chime (Dkt. 1-4 at p. 2), including but not limited to the membership interests in Chime under the aforementioned three Purchase Agreements involving Ruckman.

31. Ruckman has complied with the "Representations and Warranties of Buyer" set forth in paragraph 3 (and subparts thereof) of each of the three aforementioned Purchase Agreements.

32. Before Ruckman agreed to purchase the membership interests in Chime, O'Conor told Ruckman that he would use the proceeds from Ruckman's investments to finance Chime's operations. O'Conor made these statements to Ruckman in person in or around Ruckman's or O'Conor's home in Steamboat Springs, Colorado in late May and early June 2015.

33. These representations regarding how the investment proceeds would be used were material to Ruckman's decision to purchase the Chime membership interests because Ruckman understood that, at the time of the investments, Chime was not generating any income and that Chime's sole source of cash for financing its ongoing operations were the investment proceeds from Ledgewood. Accordingly, Ruckman believed and understood that the value of his investment in Chime would be greatly diminished unless the money he gave to Ledgewood for the

membership interests was used to fund Chime's operations. Because of this, Ruckman would not have purchased the Chime membership interests from Ledgewood and O'Conor if he knew O'Conor would not use the money to fund Chime's operations.

34. Upon information and belief, O'Conor's representations regarding the use of the Ruckman investment proceeds to fund Chime's operations were false in that O'Conor did not use the funds to finance Chime's operations. Instead, upon information and belief, O'Conor used the funds almost exclusively for his own personal benefit and account.

35. In a letter dated September 6, 2018, O'Conor wrote to counsel for Ruckman and other Chime investors that "[i]t is also clear to investors that a portion of the proceeds of [the] sales of my personal membership interests were to be used by me for my personal expenses and a portion were to be reinvestment [sic] by me into Chime to help fund operations." (Dkt. 1-4 at p. 2). Before this September 2018 letter, Ruckman was never informed – by Ledgewood, O'Conor, or any person or entity, in writing or otherwise – that the funds from Ruckman's purchase of the Chime membership interests were to be used, might be used, or were intended to be used, in any significant amount, by O'Conor for O'Conor's personal expenses, account, or benefit.

36. In addition to being a Chime investor, Ruckman was an employee of Chime beginning in 2015 and until January 2018. During this period, he was Chime's Vice President of Operations.

37. In 2015, O'Conor (on behalf of Chime) and Ruckman agreed that Ruckman would provide services to Chime while temporarily deferring payment for those services since, at the time, Chime had limited operating capital. Nevertheless, O'Conor and Ruckman agreed that Chime would pay Ruckman for services rendered at a later date once Chime secured adequate investment and financing.

38. In the course of their communications regarding Ruckman's employment with Chime, O'Conor asked Ruckman what his hourly rate was. Ruckman responded that his rate was $250 per hour. O'Conor verbally agreed to compensate Ruckman for his services at this rate and never expressed any objection to it.

39. During his time as an employee and/or officer of Chime, Ruckman spent more than 3,000 hours working on Chime-related duties for, on behalf, and for the benefit of Chime and O'Conor and at the sole discretion of O'Conor and Chime.

40. Ruckman asked O'Conor for a written employment agreement setting forth, among other things, Ruckman's salary or compensation.

41. Ruckman was told by O'Conor that such a written employment agreement was not necessary and that Ruckman would be paid for his time spent working on Chime-related duties for, on behalf, and for the benefit of Chime and O'Conor.

42. Ruckman was given the impression that Counterclaim Defendants were trustworthy and able to pay the agreed-upon compensation by, among other things, the fact that O'Conor was living a lavish lifestyle in a mountain vacation destination.

43. During his time as a Chime employee, Ruckman understood and agreed that he had a verbal employment agreement with O'Conor and/or Chime under which Ruckman would be paid for his time spent working on Chime-related duties.

44. Upon information and belief, during Ruckman's time as a Chime employee, O'Conor understood and agreed that he had a verbal employment agreement and contract with Ruckman under which Ruckman would be paid for his time spent working on Chime- related duties.

45. At all times during his employment with Chime, Ruckman and O'Conor consistently operated and interacted in a manner consistent with the fact that Ruckman was an

7

employee and/or officer of Chime who would be paid for his time spent working on Chime-related duties.

46. Ruckman was reimbursed for certain of his Chime-related out-of-pocket expenses by O'Conor or Chime.

47. Ruckman, however, was never compensated or paid any amount by Chime or O'Conor for any of the thousands of hours Ruckman spent working on Chime-related duties.

48. During his time as an employee and/or officer of Chime, Ruckman and O'Conor discussed locating Chime's headquarters in the Dallas, Texas area.

49. Ruckman offered to move himself and his family to the Dallas, Texas area in anticipation of Chime establishing its headquarters there, and O'Conor accepted and agreed to Ruckman's offer.

50. O'Conor told Ruckman that Chime and/or O'Conor would pay or reimburse Ruckman for any costs or expenses related to Ruckman's move to the Dallas area.

51. As a result of O'Conor's agreement that Ruckman should move to the Dallas area, Ruckman sold his home and moved to the Dallas area in March, 2017.

52. Ruckman, however, was never compensated, paid, or reimbursed by Chime or O'Conor for any costs or expenses related to Ruckman's move to the Dallas area.

53. Throughout Ruckman's time as an employee and officer of Chime, O'Conor consistently led Ruckman to believe that Chime was on the verge of landing significant investments, including from the likes of Steve Forbes and Carl Icahn. Upon information and belief, O'Conor did so intentionally in order to avoid having to pay Ruckman for his time and services rendered.

54. In late 2017 or early 2018, however, it became clear to Ruckman that Chime and O'Conor had no intention of compensating Ruckman for services rendered, that Chime was very

unlikely to achieve the investments or success that O'Conor had led Ruckman to believe were just around the corner, and that Ruckman's investments in Chime were probably worthless.

### COUNTERCLAIM I – SECURITIES FRAUD (COLORADO SECURITIES ACT) – AGAINST O'CONOR AND CHIME

55. Ruckman incorporates by reference Counterclaim paragraphs 1-54 above, as if fully set forth herein.

56. The membership interests that are the subject of the aforementioned Purchase Agreements, Exhibits 1-3, are securities.

57. New Direction IRA, Inc. entered into the first and second Purchase Agreements, Exhibits 1 and 2, for the exclusive benefit of Ruckman and using Ruckman's funds. Ruckman directly entered into the third Purchase Agreement, Exhibit 3.

58. At least at the time Ruckman purchased the membership interests in Chime through Ledgewood, O'Conor directly controlled both Ledgewood and Chime.

59. At least at the time of Ruckman's purchases, O'Conor – as Chime's sole director – was also acting as Chime's agent.

60. O'Conor made a false statement of material fact, or omitted to state a material fact, when he represented to Ruckman that the proceeds from Ruckman's purchase of the Chime membership interests would be used to fund Chime's operations and/or when he failed to inform Ruckman that O'Conor would use the proceeds for his own benefit and account.

61. O'Conor made these false misrepresentations or omissions in connection with Ruckman's potential purchase of the Chime membership interests from Ledgewood.

62. But for O'Conor's representations regarding the use of the proceeds to finance Chime's operations, Ruckman would not have purchased the Chime membership interests.

63. Before the summer or fall of 2018, Ruckman did not know, nor could he have reasonably known, that O'Conor used the proceeds from Ruckman's investment for his personal benefit and account, instead of using the proceeds to fund Chime's operations.

64. Ruckman has suffered consequent and proximate injury as a result of O'Conor's fraud and misuse of funds intended by Ruckman to be used for investment purposes in Chime.

65. Because of Counterclaim Defendants' wrongful acts, Ruckman has been required to retain the law firm of Hilgers Graben PLLC to prosecute his claims. Ruckman has agreed to pay his attorneys reasonable fees and expenses for their services. Ruckman is entitled to recover his reasonable and/or necessary attorneys' fees and costs incurred in the prosecution of this counterclaim pursuant to applicable statutes. In the event of an appeal to the court of appeal, Ruckman would be further entitled to additional reasonable and necessary attorneys' fees; in the event of an appeal to the Supreme Court, Ruckman would be entitled to additional reasonable and necessary attorneys' fees.

**COUNTERCLAIM II – COMMON LAW FRAUD – AGAINST O'CONOR AND CHIME**

66. Ruckman incorporates by reference Counterclaim paragraphs 1-65 above, as if fully set forth herein.

67. Upon information and belief, O'Conor knew that his representations to Ruckman that the proceeds from Ruckman's purchase of the Chime membership interests would be used to fund Chime's operations were false.

68. O'Conor knew that it was important to Ruckman that the proceeds be used to finance Chime's operations, and O'Conor intended for Ruckman to rely on O'Conor's representations regarding the use of the proceeds.

69. But for O'Conor's representations regarding the use of the proceeds to Ruckman, Ruckman would not have purchased the Chime membership interests.

70. Ruckman has suffered consequent and proximate injury as a result of O'Conor's fraud and misuse of funds intended by Ruckman to be used for investment purposes in Chime.

**COUNTERCLAIM III – BREACH OF FIDUCIARY DUTY – AGAINST O'CONOR**

71. Ruckman incorporates by reference Counterclaim paragraphs 1-70 above, as if fully set forth herein.

72. At all relevant times, O'Conor has been an officer and/or director of Chime.

73. Upon information and belief, Chime's operating/LLC agreement provides that Chime's officers and directors may be held liable to Chime and its members for "(i) for any breach of his or her duty of loyalty to the Company or its Members; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; or (iii) for any transaction from which the officer or Director derived an improper personal benefit."

74. O'Conor has diverted funds intended to fund Chime's operations and has used them instead for his own personal benefit and account. In so doing, O'Conor breached one or more of his duties to Chime's members, including Ruckman.

75. Ruckman has suffered consequent and proximate injury as a result of O'Conor's breach of fiduciary duties, in an amount to be determined at trial.

**COUNTERCLAIM IV – BREACH OF EMPLOYMENT CONTRACT – AGAINST CHIME**

76. Ruckman incorporates by reference Counterclaim paragraphs 1-75 above, as if fully set forth herein.

77. In approximately 2015, Ruckman and Chime consented to and entered into an oral employment contract whereby Ruckman agreed to render his professional services at a rate of $250 per hour, with compensation to be deferred temporarily until Chime and/or O'Conor could secure more financing or investment.

78. Under the employment contract, Ruckman spent thousands of hours performing duties and tasks on behalf and for the benefit of Chime and O'Conor.

79. Under the employment contract, Ruckman, O'Conor, and Chime consistently operated and interacted in a manner consistent with the fact that Ruckman was an employee and/or officer of Chime who would be paid for his time spent working on Chime-related duties. Additionally, O'Conor, and Chime consistently operated and interacted in a manner consistent with the fact that Ruckman was an employee and/or officer of Chime who would be paid for his moving expenses related to relocating to the Dallas, Texas area for the opening of Chime's headquarters.

80. Ruckman at all times performed and complied with his obligations as an employee and/or officer of Chime.

81. In late 2017 or early 2018, however, Ruckman realized that Chime and O'Conor had no intention of compensating Ruckman for his services. Ruckman therefore resigned his position as a Chime employee and officer.

82. Chime has breached the employment contract by failing or refusing to compensate Ruckman for the time Ruckman spent performing Chime-related duties and tasks under the employment contract, or for Ruckman's moving expenses and related cost for relocating to the Dallas area.

83. As a result of Chime's and/or O'Conor's breach of the employment contract, Ruckman suffered and continues to suffer damages resulting from Chime's and/or O'Conor's failure or refusal to pay or compensate Ruckman for performing Chime-related duties and tasks under the employment contract.

84. Because of Counterclaim Defendants' wrongful acts, Ruckman has been required to retain the law firm of Hilgers Graben PLLC to prosecute his claims. Ruckman has agreed to pay

his attorneys reasonable fees and expenses for their services. Ruckman is entitled to recover his reasonable and/or necessary attorneys' fees and costs incurred in the prosecution of this counterclaim pursuant to applicable statutes. In the event of an appeal to the court of appeal, Ruckman would be further entitled to additional reasonable and necessary attorneys' fees; in the event of an appeal to the Supreme Court, Ruckman would be entitled to additional reasonable and necessary attorneys' fees.

### COUNTERCLAIM V – UNJUST ENRICHMENT (MONIES HAD AND RECEIVED) – AGAINST O'CONOR

85. Ruckman incorporates by reference Counterclaim paragraphs 1-84 above, as if fully set forth herein.

86. The money that O'Conor took from Ruckman pursuant to the Purchase Agreements and otherwise used for O'Conor's personal purposes and expenses, or otherwise used for non-Chime purposes, represents a benefit and unjust enrichment to O'Conor and/or Chime.

87. This unjust enrichment of monies had and received was at the expense of Ruckman.

88. Under the circumstances it would be unjust for O'Conor to retain the benefits, without commensurate compensation to Ruckman in the form of a refund of the monies Ruckman invested in Chime.

### COUNTERCLAIM VI – UNJUST ENRICHMENT (SERVICES RENDERED) – AGAINST CHIME AND O'CONOR

89. Ruckman incorporates by reference Counterclaim paragraphs 1-88 above, as if fully set forth herein.

90. In the alternative to Counterclaim IV, the services rendered by Ruckman to O'Conor and/or Chime, including Ruckman's relocation to the Dallas area and the roughly 3,000 hours of uncompensated professional services represent a benefit and unjust enrichment to O'Conor and/or Chime.

91. This unjust enrichment was at the expense of Ruckman.

92. Under the circumstances it would be unjust for O'Conor and/or Chime to retain the benefit of Ruckman's services, including his relocation to the Dallas area, without commensurate compensation to Ruckman in the form of the value of those services rendered and the cost of the relocation expenses incurred by Ruckman.

## **PRAYER AND RELIEF REQUESTED**

Ruckman, in connection with his foregoing Counterclaims, respectfully requests that the Court:

93. Enter judgment in favor of Ruckman and against O'Conor and Chime with respect to each of Ruckman's Counterclaims and each of Plaintiffs' claims;

94. Enter judgment that O'Conor and Chime take nothing in this suit and that all relief requested by O'Conor and Chime be denied;

95. Award monetary damages and/or compensation to Ruckman, in the amount of at least $1,000,000, plus pre- and post-judgment interest, costs, and expenses;

96. Enter judgment awarding punitive damages to Ruckman due to O'Conor's fraud, as set forth in the Counterclaims above;

97. Enter judgment awarding to Ruckman for his reasonable and necessary attorneys' fees incurred in defending against Plaintiffs' claims and in bringing and litigating Ruckman's Counterclaims; and

98. Enter judgment awarding all such other monetary or injunctive relief to which Ruckman may be entitled either at law or in equity.

## **JURY DEMAND**

Ruckman and Halagard, Inc. hereby demand trial by jury on all issues, claims, and counterclaims so triable.

Dated: July 10, 2020            Respectfully submitted,

           */s/ Andrew R. Graben*
           Andrew R. Graben
           Texas State Bar No. 24045964
           HILGERS GRABEN PLLC
           10000 N. Central Expressway, Suite 400
           Dallas, Texas 75231
           Email: agraben@hilgersgraben.com
           Phone: (214) 842-6828
           Facsimile: (877) 437-5755

           **Attorneys for Defendant Halagard, Inc. and for Counterclaim-Plaintiff Mark Ruckman**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served via the Court's ECF system on July 10, 2020, upon counsel of record for Plaintiffs.

           /s/ *Andrew R. Graben*
           Andrew R. Graben